The UNITED STATES
v.
Edward Blair JONES.
Crim. No. 73-83.

United States District Court,
E. D. Pennsylvania.
June 15, 1973.

Robert E. J. Curran, U. S. Atty., Gilbert J. Scutti, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Jack M. Myers, Philadelphia, Pa., for defendant.

## OPINION

BECHTLE, District Judge.

The sole issue involved in this criminal case is that of entrapment. By reason of the importance of the issue of credibility in this particular instance, a recapitulation of the pertinent testimony heard by the Court without a jury is set forth below:

### Testimony

#### A.  Uncontroverted Facts

Special Agent William Bouldin ("Agent") of the Bureau of Narcotics and Dangerous Drugs ("BNDD") met with James Hearn ("Hearn") for the first time immediately after a preliminary hearing on an unrelated narcotics charge in State Court at Philadelphia implicating Hearn.  Agent asked Hearn if he would be willing to cooperate with Federal narcotics officials by supplying information, in return for which the Government would make such cooperation known to the state authorities where Hearn was awaiting final disposition of outstanding drug violation charges.[1]

On or about January 7, 1973, Hearn contacted Agent and informed him that the defendant, Edward Blair Jones ("Defendant"), was interested in selling some methamphetamine ("meth"). Agent, using a fictitious identity, phoned Defendant; they discussed terms, and set up a time and place to consummate a sale of a half-pound of meth for $1,800.  The sale was to take place at a Philadelphia restaurant on January 9, 1973.  On the appointed day, Agent and his partner, Special Agent Eckert of the BNDD, met with Defendant in Linton's Restaurant at Cottman

---

1. Hearn had two state cases involving narcotics pending against him when this suggestion was made.

Avenue and Roosevelt Boulevard in Philadelphia, Pennsylvania, at which time Defendant handed the undercover agents a cigarette pack empty except for a drug sample, which they there tested and approved. Apparently, under the terms of the sale that Hearn had arranged with Agent before Hearn induced Jones to become a participant, the half-pound of meth was to be produced at the place of sale by someone other than Jones. Jones was advised that, if the sample were satisfactory, he should then go to a telephone and advise William Calafatti ("Calafatti"), who presumably would then see that the meth was transported to the site of the sale. The agents exhibited to Defendant the purchase money. Defendant excused himself and went to another point in the restaurant to make the phone call and returned. A few minutes later, Defendant again excused himself, went outside and across the street. He promptly returned, beckoned the agents outside and led them to a gold Dodge Duster automobile ("Duster") located in the restaurant parking lot. He unlocked the car and removed a package, which later turned out to be the half-pound of meth intended to be the subject of the sale. He was promptly arrested, at which time the agents identified themselves as Federal narcotics agents. The Duster had been stolen from its lawful owner earlier that day and placed on the parking lot by unknown persons (the uncontradicted testimony is that the defendant arrived at the restaurant in a small red truck which had been seen by other surveillance agents).

B. *The Defendant's Version*

Defendant stated that he first met Hearn in a bar at Broad and Olney Streets in Philadelphia about two or three weeks prior to the date of arrest. Their discussion involved carpeting, which was Defendant's line of business. Three days later, Hearn came to visit the Defendant at his place of business, together with two men whom Defendant had never seen before. These persons tried to set up a sale of some Colombian marijuana which Defendant refused. After the refusal, Hearn asked Defendant if he wanted to make some money from time to time and he handed Defendant a small packet which he accepted and kept. Hearn told Defendant it was meth. Defendant put the packet in his desk after the men left and the following week he used it as a sample on two different occasions in an attempt to secure a purchaser for a larger quantity but was not successful. Thereafter, Hearn called Defendant to inform him that he knew someone who was interested in buying some meth like the sample. Defendant asked Hearn why Hearn could not sell it himself and Hearn indicated that because of his pending cases it would be too risky. Hearn gave Defendant the telephone number of the prospective purchaser and the Defendant called the number and spoke with the person (who in reality was Agent) and the arrangements were made for the sale of a half-pound of meth for $1,800 which were terms that Defendant understood Hearn had already negotiated with this purchaser. Under these terms, Jones was not given the half-pound to take to the sale site. Rather, he was told by Hearn that if the sample was all right he should call Calafatti, whose role was presumably to initiate the delivery of the half-pound of meth to the restaurant. Defendant testified that at Linton's, when he left the restaurant table after exhibiting the sample and seeing the agents' money, he went to a telephone in the restaurant and called Calafatti, who was supposed to supply the meth. Defendant stated that Calafatti told him on the telephone to watch for a gold Duster in the Linton's parking lot and that, when he saw it, he should leave the restaurant, proceed across the street to a bar and get further instructions from someone in there. Defendant said that, in accordance with these instructions, he then left the restaurant at the appointed time, crossed the street, went into the bar and that Hearn was in there and told him that the meth was in

the Duster. Hearn then handed the Defendant the keys to the Duster. Defendant took the keys, went outside, beckoned the agents from their seats in the restaurant, went over to the gold Duster, removed the meth, turned it over to the agents and was prompty arrested.

### C. *The Informant*

Hearn (contrary to Agent's testimony) stated that his purpose in aiding the Federal authorities was to help clean up the drug traffic in the city. He stated that his willingness to assist was not to secure favorable influence regarding the disposition of his pending state cases. He testified that he heard that Defendant may be interested in buying some marijuana, so he took two friends "from the West Coast," and otherwise unidentified, to meet with Defendant in late December, 1972, at Defendant's place of business. Defendant turned down the offer to buy marijuana. Hearn denied asking Defendant if he wanted to sell meth and he also denied handing him a "sample." Hearn testified that after this initial meeting Defendant called *him* to discuss narcotics generally. Hearn stated that, thereafter, he called Defendant and asked him if he wanted to sell some meth because he, Hearn, had a buyer. Hearn testified that Defendant replied that he, Defendant, was interested in going ahead with the sale.

Hearn denied being in the bar across the street from Linton's on January 9. Hearn also denied furnishing any keys to the Duster to Defendant. In support of this denial as to Hearn's whereabouts on that day, the Government produced Hearn's sister-in-law with whom Hearn lived at the time, who testified that she recalls he was home sick all that day.

### D. *Entrapment*

■ The fact that law enforcement officials merely afford the opportunity for commission of a criminal act does not, without more, constitute entrapment. Oftentimes, a law enforcement official must rely on stealth and a strategy of encouragement for persons predisposed to commit criminal acts, needing only the opportunity to do so. If the criminal act, however, is the singular product of creative activity of law enforcement officials, the defense of entrapment will insulate the actor from criminal charges that grow from such activity. United States v. Silver, 457 F.2d 1217, 1219 (3rd Cir. 1972). Once the defense of entrapment is properly raised, the Government has the burden of proving beyond a reasonable doubt that the defendant was *not* entrapped. United States v. Silver, *supra*, at 1220.

■ While the testimony of the agents appeared to be straight-forward and generally credible, there is no evidence resulting from the Government's testimony (other than informant Hearn) that this defendant, prior to the time he came into possession of the sample of meth, had any predisposition or even involvement in criminal activity of any kind, let alone trafficking in drugs. Defendant, in his own testimony, admitted that after he had received the sample of meth he attempted unsuccessfully to sell it on his own. Although these aborted efforts do not speak well for Defendant's sense of law-abiding responsibility neither can they form the necessary predisposition for the restaurant sale that took place several days later. This is so because the restaurant sale, as well as these other attempts, all depend upon the initial visit by Hearn to Defendant's place of business for their underpinning. Hearn was not a credible witness. His statement that he agreed to help Federal narcotics officials in order to rid the city of drug traffic collides headon with his further statement that he introduced some unnamed "West Coast" drug traffickers to Defendant in regard to a possible marijuana sale. Hearn's testimony similarly differs materially with Agent's testimony, who stated that Hearn was willing to assist Agent in return for the relaying of such cooperation to other state prosecution authorities who would be interested in Hearn's positive qualities from the viewpoint of considering possible sentences. The Court believes that Hearn, in an effort to enhance his posture with sentencing authorities on

the state level, pressed to the point of creating the series of events that began with the handing over of a sample of meth to Defendant and ended with Defendant's arrest on Linton's parking lot on January 9, 1973. The Government relying entirely on Hearn for the crucial elements to avoid the defense of entrapment has not proven beyond a reasonable doubt that there was not entrapment of Defendant.

The Court stands foursquare on the proposition that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of an offense does not defeat the prosecution; nor will a mere fact of deceit defeat the prosecution, for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play. The evidence supports that conclusion in this case. *See*, United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (decided April 24, 1973).