**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Alfred KOWALSKI, Defendant-Appellant.**

**No. 74–1171.**

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1974.

Decided Aug. 19, 1974.

Rehearing Denied Sept. 16, 1974.

Rehearing and Rehearing En Banc Denied Nov. 26, 1974.

Pell, Circuit Judge, dissented with opinion.

William R. Kelly, Peoria, Ill., for defendant-appellant.

Donald B. MacKay, U. S. Atty., Springfield, Ill., Max J. Lipkin, Asst. U. S. Atty., Peoria, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* and PELL and SPRECHER, Circuit Judges.

CLARK, Associate Justice.

Alfred Kowalski was convicted by a jury of violating Title 18, U.S.C. § 922(a)(1) [engaging in the business of importing, manufacturing or dealing in firearms]. On his appeal he raises six points: (1) Is Section 922(a)(1) unconstitutionally vague and indefinite; (2) is the evidence sufficient to support the verdict; (3) was it error to cross-examine Kowalski regarding pending state charges; (4) may prior felony convictions more than twenty-five years old be used for impeachment; (5) is it error to allow proof by hearsay that one of the guns allegedly sold by Kowalski was stolen; and (6) was it prejudicial for the prosecutor to characterize one of the guns in question as a "sniper's gun", etc.

Wayne Stebins offered to sell a rifle (that Kowalski was holding on a $100 loan owed by Stebins) to David Krug, a Treasury Agent. Krug, Stebins and another Treasury Agent went to Kowalski's house to obtain the gun. While the

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

Agents remained in a van truck, Stebins went into Kowalski's house and returned alone with the gun which he sold to Krug for $125.00, which money Stebins later paid to Kowalski. Thereafter a Government informer, Junior Lucas, took the Agents to Kowalski's house and inquired of Kowalski if he had any guns for sale. The latter said that he had "a varmint rifle" and after some dickering over the price, Kowalski sold the rifle to Krug for $150.00, with some ammunition thrown in. Some two weeks later the same parties returned to Kowalski's house and purchased a .45 caliber target pistol for $150.00 and an old 16 gauge shotgun for $30.00.

Kowalski was regularly employed as a truck driver by Ruan Transport Company, was 60 years of age and married. From June 7, 1973 until October 2, 1973, Kowalski did not sell or purchase any other firearms nor did he spend any time locating additional firearms to sell.

The statute in question provides that except for a licensed importer, licensed manufacturer, or licensed dealer, it "shall be unlawful . . . to engage in the business of importing, manufacturing or dealing in firearms or ammunition. . . ." We hold that the statute is not unconstitutionally vague; that Kowalski was engaged "in the business of . . . dealing in firearms . . ." in violation thereof; and that there is no merit in the remainder of his points.

■ 1. As to the vagueness claim, we find that this Circuit has upheld the Act under that attack in two cases, United States v. Zeidman, 444 F.2d 1051 (1971) and United States v. Gross, 451 F.2d 1355 (1971). In the latter case the Act was found "not impermissibly vague", Id. at 1357. Likewise three additional circuits have upheld it: Kaneshiro v. United States, 445 F.2d 1266 (9th Cir. 1971); United States v. Day, 476 F.2d 562 (6th Cir. 1973) and United States v. Wilkening, 485 F.2d 234 (8th Cir. 1973). The single case cited by Kowalski is wholly inapposite. It involved a vagrancy statute in the District of Columbia and typical of those acts, used such terms as "loitering"; "leading an immoral and profligate life", etc. And it was properly held vague. Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968). We uphold the Act involved here.

■ 2. Kowalski attacks the evidence as being insufficient to support the jury verdict. However, a reading of the transcript reveals at least three sales of prohibited weapons, a .225 Winchester rifle, a .45 pistol and a 16-gauge shotgun. In addition, Kowalski received the proceeds of a fourth prohibited gun sale, a .30–.30 rifle. Moreover statements by Kowalski to the Government agents and admitted by Kowalski but at trial claimed to be: "That was just, like I say, just wind-ing it a little bit, playing it bigger than I should have and got myself into trouble" indicate other illegal activity under the Act. These included receiving a shipment of ten stolen rifles, after which he tried to contact Krug but could not find him and so he sold them to others; that he was trying to re-stock his gun supply; that he went to Michigan to get some guns but only got one and it was no good; and that he got guns in and out all the time for sale. We believe the evidence quite sufficient.

■ 3. Kowalski claims that the prosecutor's questions on cross-examination if he had ever been convicted of a felony were all too remote in years, i. e. 1932, 1937 and 1948. However the cases are to the contrary. See United States v. Dow, 457 F.2d 246 (7th Cir. 1972); United States v. Morefield, 411 F.2d 1186, 1188 (7th Cir. 1969); United States v. Escobedo, 430 F.2d 14, 18–20, (7th Cir. 1970), cert. den., 402 U.S. 951, 91 S.Ct. 1632, 29 L.Ed.2d 122.

■ 4. During the interrogation as to prior felonies, the prosecutor also asked Kowalski: "You have been charged in state court in Bureau and La Salle County", and the answer was: "conspiracy". The prosecutor then asked: "How many charges are pending against you there, sir", whereupon objec-

tion was made. The court sustained the objection "to the pending charges." Kowalski then moved for a mistrial which was denied. The court did instruct the jury "to disregard the question and any implications of it." The question should not have been asked and we agree with the dissent's criticism of the Assistant United States Attorney. However we note that Kowalski made no objection to the previous question. Indeed he answered it. The prosecutor then asked the details. In light of the court's specific charge to the jury that the question as to the pending charges be stricken and that they disregard "the question and any implications of it", we find it harmless, especially in light of the entire record.

The direct evidence of guilt was overwhelming—indeed it was admitted by Kowalski save for the point as to whether the number of sales etc. was sufficient to find that he engaged in the business of dealing in firearms. The jury found against him on this point under the court's charge to which there was no objection. There was no indication of bad faith on the part of the government. Indeed, the previous question as to Kowalski being charged in "Bureau and LaSalle County" had already been answered without any objection. We reiterate the question should not have been asked, and the prosecutor is censured for posing it, but in view of the overwhelming evidence of guilt as well as the manner and time in which the question was asked, we find that there was no prejudice.

5. The claimed hearsay nature of the evidence as to one of the guns involved being stolen is not correct. It is true that in tracing the sale of the gun the Agent received information as to the sequence of purchasers. However, upon going to the ultimate purchaser, he found that the gun was stolen. He then contacted the Sheriff of Putnam County who forwarded the official report showing the gun was stolen. Moreover, Kowalski admitted on cross-examination

that he had told Agent Krug the gun was stolen at Granville. At trial he testified that he had traded a .243 target rifle for it at a gun show in Princeton. He said: "I was questioning around if anybody had a smaller gun that I could trade around. The guy asked me to look at it." The trade took place, he said, "right at the edge of where they—where all the gun show—where the people were." Kowalski remembered that it was in 1971 but could not remember the day, the month and "didn't even ask him" (the seller) his name. "He didn't ask me mine."

■ 6. Nor was the prosecutor's comment that the gun might be a "sniper's gun" prejudicial. The gun was before the jury, had a scope on it and was called "a varmint gun" by Kowalski. The referenced characterization is not claimed to have referred to Kowalski as a sniper. It was fair comment under the evidence.

The other claims of Kowalski are frivolous and the judgment is

Affirmed.

PELL, Circuit Judge (dissenting).

In a recent per curiam opinion, United States v. Dilts, 501 F.2d 531 (7th Cir., 1974), a panel of this court stated:

"We have previously felt compelled to criticize this Assistant United States Attorney for departing from the record. [See United States v. Hernandez, 486 F.2d 614, 618 (7th Cir. 1973).] In view of this history, we have considered the need for an exercise of our supervisory power as a deterrent to deliberate prosecutorial misconduct. Cf., United States v. Trutenko, 490 F.2d 678, 681 (7th Cir. 1973). We have concluded, however, that since the flagrant misconduct occurred before us, rather than in the trial court, these judgments should not be reversed." (At 8, footnotes omitted.)

Now we have another case involving the same Assistant United States Attor-

ney who engaged in what, in my opinion, was sufficiently flagrant misconduct in the trial court that we should exercise our supervisory power and reverse a judgment in what has the earmarks of an unfair trial because of that misconduct. Accordingly, I respectfully dissent.

The record brooks of no dispute of the fact that Kowalski sold firearms on more than one occasion. He was not charged, however, with the sale of guns, or with possession of prohibited guns, but with being in the business of dealing in firearms. Just where the line is to be drawn between sales by a dealer engaged in the business and by an owner of firearms engaged in a casual, occasional sale is a difficult one to draw. The statute does not prescribe any standards for determining when a person is "engaged in the business." United States v. Zeidman, 444 F.2d 1051, 1055 (7th Cir. 1971). I do not conceive that the statute should be interpreted to the effect that once a person has acquired a firearm he should forever afterwards be precluded from disposing of it by threat of a substantial prison sentence if he does so.

On the customary basis of considering the evidence on appeal from a criminal conviction in the light most favorable to the Government, this court might well affirm in the ordinary case involving sales of firearms on only two occasions. However, the record does not reflect the ordinary case but instead one in which conduct on the part of the prosecutor was such that I cannot say it was not a factor in tipping a close case toward the side of conviction. In any event, our supervisory power should have been called into play.

The trial in this case commenced on January 15, 1974, at 10 a. m. All evidence was submitted, final arguments made, and the jury charged by 4:30 p. m. on the same day. Sometime after 9:00 p. m. the jury sent the following note to the judge: "After 10 votes, we have not been able to come to a verdict. We see no chance of reversal of any of the votes." An hour later, the jury returned to the courtroom where the instructions were reread to the veniremen. At fifteen minutes before midnight, the jury returned its guilty verdict.

During this compact exercise in the administration of justice, at the conclusion of which Kowalski, then aged 60, was found guilty of a crime which would result in his incarceration for three years, the Assistant United States Attorney, an experienced and veteran legal practitioner, engaged in conduct which appears to me to be designedly and by improper means denigrating of the defense advanced by Kowalski's appointed counsel. Unfortunately, his counsel did not preserve the record that should have been made on these occasions; however, I consider the errors on the part of the prosecutor to have affected substantial rights of Kowalski and therefore a basis for reversal. Rule 54, Fed.R.Crim.P.[1]

*Impeachment Proceedings*

I agree with the majority that as the law stood at the time of the trial, and as it now stands despite the more compassionate (and probably more realistic) ten-year limitation reflected in Rule 609(b) of the Proposed Rules of Evidence for United States District Courts and Magistrates, remoteness of the crime is not a basis for excluding queries to a witness about his prior criminal convictions. The remoteness aspect,

---

1. Kowalski's counsel also embarked on what he apparently considered a necessary trial tactic despite the objection of the prosecutor and the admonition of the judge. The tactic can only charitably be described as unique. When federal Treasury agent Krug was being cross-examined, counsel asked him if Kowalski hadn't told the agent, then undercover, that he, Kowalski, "was going to get a shipment of narcotics that he wanted to sell you?" This line first introduced by Kowalski's counsel was pursued throughout the trial apparently to demonstrate that the defendant was just engaged in a lot of big talk and nothing else. It did not minimize the aspersions cast by the prosecutor, the effect of which was to make Kowalski the possessor of generalized criminal attributes.

however, is only a part of the cumulative picture.

At trial, the prosecutor opened this phase of his cross-examination of Kowalski not by asking him as to whether he had been convicted of a certain crime at a certain time and place but instead asked, "Now, Mr. Kowalski, have you ever been convicted of a felony?" A general objection was overruled and Kowalski responded, "Well, I don't know whether it was a felony or not. I was convicted—"

But before pursuing further the cross-examination, it should be noted that the prosecutor was fully aware of the defendant's criminal record. At a hearing more than a month prior to the trial, after referring to a pending state conspiracy charge to deliver a controlled substance sometimes referred to as "speed," which charge emanated from the same transactions as the federal firearms indictment, the prosecutor stated the following:

"In addition, the defendant's record indicates that since 1942 the defendant has not been involved or does not have any felony charges against him. He has had several charges in '47, '48 and '49—one each. I should say—for being intoxicated. I don't know what 'ADW' means.

"THE CLERK: Assault with a deadly weapon.

"MR. LIPKIN: Assault with a deadly weapon, but no conviction and no disposition.

"It is true that back in the '30's the defendant was charged at one point in '35 with vagrancy and in '37 with auto theft, but no disposition was ever made, except on the vagrancy charge he had 30 days in the House of Correction; and in '32 he was charged with manslaughter arising with leaving the scene of an automobile accident and was fined a dollar and served three months in the House of Correction.

"One further investigation, as I have indicated, indicates that since this time and during this period, with the exception of this particular offense and the one involving his offer to obtain narcotics, he has no criminal record and has been working and has been in no trouble."

The prosecutor apparently was sufficiently impressed with Kowalski as being at present a law-abiding citizen that he recommended probation on a guilty plea. Nevertheless, when the court declined to accept the guilty plea on the basis of probation being granted and the case went to trial, the prosecutor proceeded on a line of interrogation which I can only conceive was one designed to leave with the jury the impression that this defendant was a menace to the community.

The following pertinent portions of the transcript of evidence are noted:

"Q. Do you know what I'm talking about, sir?

"A. Well, if—I don't know just what you mean by 'felony.' I know 1932 I went to jail for 90 days for manslaughter charge on an automobile accident."

\* \* \* \* \* \*

"Q. How about December, 1937?

"A. Well—

"Q. Do you remember that?

"A. Yes, I remember that, I went to jail for stealing some copper.

"Q. You were sentenced to one year?

"A. Right.

"Q. And in 1948, do you remember that?

"A. Yes.

\* \* \* \* \* \*

"Q. What was that charge?

"A. That charge was assault and battery.

"Q. With a deadly weapon, wasn't it?

"A. Yes.

"Q. With a gun, right?

"A. .22 rifle, they claim.

"Q. And you were found guilty of that charge?

"A. No.

"Q. Sir?

"A. I don't think I was found guilty.

"Q. Did you have a trial?

"A. Yes, I had a trial.

"Q. And you weren't found guilty?

"A. The judge . . . let's see. I don't quite recall. I think I done probation on that.

"Q. Well, you were found guilty and he placed you on probation, is that right?

"A. Well, yes, I believe it was right.

"Q. Now, in connection with your conversations with Mr. Barrett concerning which you have testified about, you have been charged in State Court in Bureau and LaSalle County.

"A. For conspiracy.

"Q. How many charges are pending against you there, sir?

Objection was sustained to the last question but motion for mistrial was denied and "the jury will be instructed to disregard the question and any implications of it." This was the only admonition given to the jury and the only apparent reference in the charge to the jury was "[t]he jury must consider only the evidence properly admitted in the case."

There are troubling aspects of the ancient crimes paraded before the jury other than their remoteness. The defendant obviously was not cognizant of what was or was not a felony. The three earlier crimes adverted to in his testimony may well have been felonies. See the discussion as to the impeaching aspects of misdemeanor convictions not involving moral turpitude, *Dilts, supra,*

501 F.2d at 533. Manslaughter is ordinarily a felony. Ill.Rev.Stat., ch. 38, §§ 9–2 and 9–3 (1973). However, as far as can be told from the record, it was only the 1932 charge which was a felony, and Kowalski was then apparently a minor. It is clear that the conviction had something to do with leaving the scene of an accident, and as far as can be told from the record he could have been convicted on a guilty plea of a lesser charge connected with leaving the scene of an accident. The penalty for a violation of this statute at the time appears to have been a fine not to exceed $200 and imprisonment in the county jail not to exceed one year, or both. Cahill Ill.Rev.Stat. 95a, ¶ 42(1) (1931). Apparently Kowalski, who was fined $1, served in the equivalent of a county jail. (The prosecutor in the pretrial hearing had referred to the House of Correction.) See Cahill's, *supra,* ch. 67. At the time in question, a felony was defined in Illinois as an offense punishable by death or imprisonment in the penitentiary. Cahill's, *supra,* 38 ¶ 614.[2]

Character and reputation for credibility and honesty are precious commodities and, it seems, should not be besmirched by anything less than clear and precise admissible proof.

Further, it is not clear whether the conviction in 1937 was for auto theft, as to which the prosecutor had said at the pretrial hearing there was no disposition, or for the theft of some copper as to which Kowalski candidly admitted a sentence of one year. The 1948 conviction, being the third and final conviction shown, is also ambiguous. Again, at the pretrial hearing the prosecutor asserted there was no conviction. But if this was the fact he permitted the defendant from an obviously hazy memory to impeach himself by a conviction. It is not clear whether the charge was assault ADW or assault and battery ADW. Un-

---

2. I have assumed that this as well as the other offenses were committed in the state of Illinois. The record is silent in this respect with the exception of the charges pending in the state courts at the time of the federal trial but, of course, these were not of impeaching caliber, not being convictions. The record, incidentally, indicates that when these state charges were tried, a hung jury resulted.

der present Illinois law at least, the former is a misdemeanor and the latter is a felony. Ill.Rev.Stat. ch. 38, §§ 12–2 and 12–4 (1973).

Even if we assume that the evidence clearly established three convictions of felonies, the last of which was approximately a quarter of a century before the present trial, the jury might well have determined that credibility was not impeached if they had not learned that charges were simultaneously pending in two counties of the state court system. This brought the matter right down to date and showed that the criminal pattern of a young man had not been shaken. District courts for obvious reasons are reluctant to declare a mistrial and scrap a practically completed trial. Here, however, I think Mr. Justice Jackson's often quoted words that "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction" [3] are particularly apropos.

I would be inclined to attribute the embarkation into the impropriety of asking about pending charges as overzealousness in a hotly contested case if the facts warranted it. Here I find no door opening requiring a prosecutorial closing. The trial had just commenced that morning and the record does not indicate the presence of vigorous confrontations between counsel. Further, I note in *Dilts* that the same prosecutor had asked about a conviction of a misdemeanor and about a pending charge against a witness. In *Dilts,* the panel held the error to be harmless. I cannot agree that it was harmless in the present case and, in any event, the beginning of a pattern having presented itself, in my opinion there should be a reversal in the exercise of our supervisory power.

### Other Misconduct

The question of the exercise of this power might be a closer one if it were not for the cumulative effect of other procedures engaged in by the Assistant United States Attorney.

### I

The district court instructed the jury that "[t]here is no clearcut definition of what constitutes engaging in the business of dealing in firearms" and that the term "means more than a single act or single transaction." The number and frequency of transactions undoubtedly has some weight in determining whether a person was engaged in the business. Apparently aware of the value in numbers, the Government presented as its first witness, Wayne Stebins, who, while testifying as to a gun transaction, clearly did not testify as to a transaction in which Kowalski made a sale. There was no contradiction to his testimony in its showing that Stebins had pawned his own gun with Kowalski to secure a loan of $100; that when Stebins had been approached by the agents about the sale of a gun, he had gone to Kowalski, secured the gun, sold it to the agents for $125 and had given Kowalski the entire amount. Kowalski had told him that he was only owed $100 but Stebins had "told him to keep the whole amount as a favor. Because I was supposed to have been back within a week for the gun and instead it was two weeks. So I told him to keep the extra $25 for his trouble."

I fail to find any evidence of being in the business of dealing in firearms from this loan transaction in which Kowalski had no contact with the buyers and in which Stebins was selling his own gun.

Since there was no objection made to this line of testimony, nor was there a motion to strike it, the admission probably standing alone would not require reversal. However, it cannot be ignored in the overall picture of whether Kowalski received a fair trial.

The only gun transactions with Kowalski in which the agents were involved occurred on August 22 and September 5, 1973. Yet the indictment which was be-

---

3. Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949).

fore the jury charged that Kowalski engaged in the business from about June 7, 1973. This was the date of the Stebins' transaction, and the testimony having gone in without challenge the jury may very well have concluded that there were illegal transactions beginning with the sale by Stebins in June.

## II

The final argument of the prosecutor continued the smearing with the brush of general criminality: "I didn't know that these are the kinds of bullets that people use for target practice. Now, you gentlemen know more about it than I do. But I don't think that these are bullets that are used for target practice. . . . We've got three guns in this case that the evidence shows were stolen. . . . I think that would be an ideal sniper's gun rather than what he said it was used for." [4]

The scope on the rifle had been placed there by Kowalski after he had removed it from another gun of his. When this changed by prosecutorial characterization from a weapon to dispose of vermin of the animal type to one directed toward humans, I find it difficult to say that the governmental finger was not pointed at Kowalski as the possessor of a lethal weapon kept for an illegal purpose. I suppose it is possible to say that one is sniping at varmints but that is not the concept that the term presents to me. Webster (Third International Edition, 1966) appears to agree in defining a sniper as "one who fires at exposed men of an enemy's force."

## III

The one gun that apparently had been stolen was in evidence as Government's Exhibit 3. During the direct examination of agent Krug as a Government witness he was asked, without objection, whether he had made an investigation to trace the gun and what was the result of that investigation. After an affirma-

tive response to the first question, Krug replied to the second that the firearm "was stolen in a residence in Granville, Illinois, along with approximately thirty other firearms." No effort was made to remove this evidence as a factor creating an inference, if not a presumption, that the possession of recently stolen property is equatable with knowledge of its tainted character. The prosecutor thought the fact that the gun was stolen was worthy of mention in his closing argument although he somehow got the number at three instead of one.

I am at a loss as to what purpose, other than that of creating manifest prejudice against Kowalski, the fact of theft had to do with Kowalski's innocence or guilt of the crime charged, which was being in the business of dealing in firearms. The charge was not possessing stolen firearms nor dealing in stolen firearms.

The prosecutor, possibly encouraged by the somewhat carte blanche privilege as to the introduction of evidence accorded by the lack of defense objections, having gotten the evidence of theft before the jury did not leave the matter there. Instead, he recalled agent Krug to the stand on rebuttal to testify as to the investigation which was objected to by the defense. The transcript reflects the following:

"Q. Mr. Krug, you will recall that on the previous examination you testified that you had made an investigation with respect to Government's Exhibit 3, being the gun with the scope, having been stolen. Will you tell the jury the date that that gun was stolen?

"MR. KELLY: Objection, your Honor. Without a proper foundation. I don't think that this man has any personal knowledge.

"MR. LIPKIN: He said he investigated it.

"By Mr. Lipkin:

---

4. Upon challenge, the district court could only recall the evidence of one theft. The evidence as to even one in this hastily disposed of trial will be dealt with separately.

"Q. Okay, will you tell us the investigation you made?

"A. Yes, our Bureau has the capability, since the Gun Control Act, to go—we call Washington and we give them the model number of the gun, serial number of the firearm and then they will call the manufacturer, in this case was Winchester.

"MR. KELLY: Objection, your Honor, to that. I think that calls for hearsay and a conclusion on his part. I think he can tell what he did or what he knows but when he starts talking—

"THE COURT: Objection is overruled.

"By Mr. Lipkin:

"Q. Go ahead.

"THE COURT: May answer what investigation he made.

"A. I called Washington, they replied to me that the gun had been shipped from Winchester to a wholesaler in Owen, Wisconsin.

"MR. KELLY: I object to any conversation outside of the presence of the defendant. It would be hearsay.

"THE COURT: Well, the objection will be overruled again, sir, and you don't have to make it on each question. The objection is overruled to this man's investigation.

"By Mr. Lipkin:

"Q. What did they tell you?

"A. That the firearm had been shipped from Winchester to a wholesaler in Owen, Wisconsin, who in turn shipped the firearm to Spring Valley, Illinois, to a dealer there. He in turn sold the firearm to an individual in Standard, Illinois, who in turn sold the firearm to a Kelvin Neubaum, of Granville, Illinois.

"I went to Kelvin Neubaum's house and talked to him and he had told me he had had two thefts of his firearms at his house, the first theft approximately $7,000, the second theft somewhat less than that.

"And he said the report was at the police station.

"I then called the Sheriff of Putnam County and he forwarded me a report which included the Winchester .225."

The agent was permitted to testify not only as to what investigation was made but what he discovered as a result thereof. This is pure and simple hearsay and over and above the lack of materiality and relevancy to the charge which was being tried, its hearsay aspects should have precluded its admission. This is not a matter of admissibility of records kept in the ordinary course of business. As a matter of fact where there was a reference to records, e. g., the sheriff's report, the record itself was not put into evidence but only the agent's report of what was in the report. In addition to the rule against hearsay evidence there also would be involved an application of the best evidence rule.

It is no answer to say as is suggested in the majority opinion that upon going to the ultimate purchaser, the agent found that the gun was stolen. The statement of the purchaser remains hearsay. If the status of the firearm as a stolen weapon had been relevant to the issue before the court the Government could easily have brought as a witness the legal owner of the gun who could have identified it as a weapon stolen from his home.

I do not believe that this further emphasis on the theft can be classified as harmless error. The fact that the gun may have been stolen was not controverted by any evidence. Kowalski testified that he had acquired it by trade from someone at a gun fair. The fact that the gun had been stolen does not negative Kowalski's testimony as to how he had acquired the gun unless it is inferred that he, himself, had done the stealing. If that is the inference that the prosecutor was intending to leave then it is a matter, also improper, of attempting to convict of one crime by proof of the commission of another.

## Conclusion

The defense asserted was not that there had been no sale of guns on two occasions but rather than Kowalski had not in making the sales engaged in the business of dealing in firearms. This defense took the form of showing that the two agents whose identities as agents were not known to Kowalski approached him. They appeared to Kowalski to be hippie types. That he reasonably could have had this impression was not denied. It could reasonably have been determined from the evidence that Kowalski had no intention of engaging in the business of dealing in firearms but was presented with an opportunity of unloading some guns he owned on a couple of fellows whom he did not respect at a goodly price and that he would "string" them along about both guns and narcotics. A tendered instruction on entrapment was denied although there is some basis for a question of proclivity to engage in the crime of the business of dealing in firearms in view of the particular defense asserted.

In reviewing the record of this trial, which was consummated from selection of jury to the retirement for deliberation in less than a full court day, I am unable to dispel the uneasy feeling that justice was subverted in the respects I have indicated to the extent that the plain error requires reversal. Whether, in the absence of the factors to which I have adverted, the jury would have found the asserted defense sufficient for acquittal is, of course, problematical. The significant matter is not whether the jury would or would not have but rather that the triers of fact should have received the case free from the smear of egregious potentially prejudicial conduct.

In referring to the dispatch with which this trial was consummated I have not intended to demean the importance of expeditious disposition of criminal cases. Prompt disposition, however, should not be purchased at the expense of a fair trial in any case and certainly not where a person's liberty is at stake.

While I regard this case as one where the defendant received sufficiently less than a fair trial as to require a reversal and a new trial, I am reluctant to fault the experienced trial judge in this respect. It is true that the burden of conducting a fair trial is a continuing obligation resting upon the judge, nevertheless, a constant sua sponte supervision in the absence of prompt proper objections not only places an unfair burden on the judge, whose primary capacity should be as an arbiter, but could itself be a form of interference with the proper development of the trial.

I am also not unsympathetic with the frustrations which may beset the prosecutor's attempts to present the case of the Government against an alleged criminal. The Assistant United States Attorney involved in the present case in the argument before this court stated the following:

> "The defendant's lawyer can do anything he wants because if it works, he's got a not-guilty plea, a not-guilty verdict, and it doesn't make any difference what happened or how he got it. It's only the prosecutor, trying to do his job—As Mr. Kelly says, I'm overzealous. I prefer to think, your Honor, I'm pretty good, not just overzealous."

The answer is if defense counsel does resort to questionably improper tactics that the prosecutor should look to the trial judge to handle the situation so as to preserve a fair trial not only for the defendant but for the Government as well. The answer is not to resort to the same type of tactics.

This, of course, does not in any sense mean that a prosecutor should not undertake vigorous and forceful advocacy. He should not, however, forget that in the case of the federal prosecutor he is a functionary of a segment of government designated not as the Department of Prosecution but as the Department of Justice.