**UNITED STATES of America**

**v.**

**Mark W. SILVER, Appellant, Carolyne A. D'Angelo.**

**No. 71-1305.**

United States Court of Appeals, Third Circuit.

Argued Oct. 7, 1971.

Decided March 28, 1972.

Bernard L. Segal, Segal, Appel & Natali, Philadelphia, Pa., for appellant.

Jeffrey M. Miller, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before KALODNER, STALEY and ADAMS, Circuit Judges.

OPINION OF THE COURT

KALODNER, Circuit Judge.

The defendant-appellant Mark W. Silver was tried to a jury on an indictment charging him with making sales of narcotics on September 4 and September 16, 1970, in violation of the federal narcotic laws.[1] The jury found Silver guilty of making a sale and delivery of narcotics —cocaine—on September 4, 1970. It was, however, unable to agree on a verdict with respect to the charged September 16, 1970 sale.[2] Silver was sentenced to serve a 5-year term—the minimum sentence fixed by law. This appeal followed.

The Government, in its case, adduced the testimony of federal narcotic agent Cassidy that he made a $1,300 purchase of cocaine from Silver on September 4, 1970 and a second purchase of $9,000 of cocaine on September 16, 1970. Federal narcotic agent Miller testified that he was present when the two sales were made. The agents testified that they had been introduced to Silver by Government informers, Yaworski and Scourfield, who had earlier informed them that Silver was involved in trafficking in drugs.

Silver testified in his own behalf. He admitted selling cocaine to agent Cassidy on September 4 and 16, 1970, as charged in the indictment. He said he made these sales only because the two informers had importuned him to do so, and had described agents Cassidy and Miller as members of the "Mafia" who would kill them, Silver, his girlfriend co-defendant D'Angelo, his pet goat, rooster, three dogs and three cats, should Silver fail to sell the agents cocaine.

Silver further testified that prior to his September sales to Cassidy he on three or four occasions in June and July 1970 procured cocaine for informers Yaworski and Scourfield for which they had promised to pay but failed to do so.

The defense called as witnesses the informers Yaworski and Scourfield who had been produced in court by the Government. The informers refused to tes-

1. 26 U.S.C.A. Sections 4704(a) and 4705 (a).

2. The jury was also unable to agree with respect to a count of the indictment which charged the defendant Carolynne A. D'Angelo with aiding and abetting Silver in the September 16, 1970 sale. The Government later moved to dismiss with respect to D'Angelo.

tify, claiming the Fifth Amendment privilege.

In rebuttal, narcotic agent Miller testified that in August 1970—several weeks before the September 4, 1970 sale—Silver had shown him a pouch-like container, attached to his belt, which contained several vials, which Silver said contained narcotics; Silver then told him he had a "connection" and a "source of supply" in San Francisco, California, who would furnish him with large quantities of "marihuana," and that he would fly to San Francisco to arrange for an initial purchase by Miller of between 200 and 250 Kilograms of marihuana. Miller further testified that Silver then had told him he could arrange with one "Chico," "his source, and his partner" for a supply of cocaine.

Silver contends on this appeal that the trial judge prejudically erred (1) in his instructions to the jury on the defense of entrapment; (2) in denying him effective assistance of counsel when he allegedly barred his counsel from conferring with him during recesses in the course of his testimony; and (3) in refusing to disqualify himself in response to Silver's affidavit of prejudice filed January 11, 1971, the day the trial began.

We will confine our review to Silver's contention with respect to the trial judge's instructions on entrapment. We are constrained, however, to note that we deem without merit Silver's second and third contentions.

The single question presented at the trial was whether the defendant had been entrapped into making unlawful sales of cocaine to the federal narcotics agents on September 4, 1970 and September 16, 1970, since he testified that he had made the sales and interposed only the defense of entrapment.

The critical question here presented is whether the trial judge committed reversible error in his charge to the jury on entrapment.

We are of the opinion that the trial judge committed reversible error in his charge to the jury on entrapment because he so *intertwined* correct instructions with incorrect instructions as to negative the effect of the correct instructions. It is settled that "[a] conviction ought not to rest on an equivocal direction to the jury on a basic issue." [3]

Discussion of the trial judge's instructions must be prefaced by this summarization of settled principles applicable to the defense of entrapment:

The fact that law enforcement officials *merely* afforded opportunity for the commission of criminal conduct does not constitute entrapment; entrapment occurs *only* when the criminal conduct was the product of the *creative activity* of law enforcement officials; in determining whether there was entrapment "a line must be drawn between the trap for the *unwary* innocent and the trap for the *unwary* criminal"; [4] the "*predisposition* and criminal design" of the defendant are the relevant factors in determining whether the defense has been entrapped and thus the Government may introduce testimony on the score of the *disposition* of the defendant to commit

3. M. Kraus & Bros., Inc. v. United States, 327 U.S. 614, 627, 66 S.Ct. 705, 710, 90 L.Ed. 894 (1946); Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 90 L.Ed. 350 (1946); Government of the Virgin Islands v. Carmona, 422 F.2d 95 (3 Cir. 1970). In the latter case we said at page 99:

"Although the trial Judge is allowed a wide measure of discretion in shaping a particular charge, United States v. Meisch, 370 F.2d 768, 774 (3 Cir. 1966), a misleading instruction is reversible error. 'A conviction ought not to rest on an equivocal direction to the jury on a basic issue.' Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). It is also long settled that an instruction must fairly set forth all of the essential elements of the crime charged."

4. Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958).

the crime;[5] it is *inconsequential* whether law enforcement officials did or did not act on *well-grounded suspicion* that the defendant was engaging in wrongdoing, or whether they had *probable cause* for approaching the defendant;[6] and, when the defense of entrapment is properly raised the burden of proof is on the Government to prove beyond a reasonable doubt that the defendant was not entrapped.[7]

Coming now to the trial judge's instructions on the entrapment defense issue:

They were given in three series (1) the main charge; (2) in responding to exceptions taken by the defendant to the charge; and (3) in answering the jury's question "[c]an legal entrapment be founded on just suspicion by the agents." The question was sent to the trial judge by the jury during the course of its deliberations.

First as to the instructions on entrapment in the main charge:

In the first part of his charge the trial judge, in substance, albeit rather inartistically, correctly instructed the jury in compliance with the requirements of the settled principles applicable to the defense of entrapment. He specifically instructed the jury that it was the Government's burden to prove beyond a reasonable doubt that the defendant was not entrapped; that "where a person has no previous intent . . . or purpose to violate the law but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment and the law as a matter of policy forbids his conviction in such a case"; "[o]n the other hand, where a person already has the readiness and willingness to break the law, the mere fact that the Government Agents provide what appears to be a favorable opportunity is not entrapment"; "[i]f . . . before anything at all occurred respecting the alleged offense involved in this case the defendant was ready and willing to commit crimes such as charged in the indictment whenever opportunity was afforded, and that the Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant is not a victim of entrapment"; and "[o]n the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some officer or agent of the Government, then it is your duty to acquit him."[8]

After the foregoing instructions were given, the trial judge, unhappily, chose to "simplify" them as follows:

> "To simplify that, members of the jury, *you are going to have this question to decide: Did the Government Agents at the time they negotiated with Mr. Silver have a history or knowledge or did they just pick him out of a group* and say, 'Well, we are going to charge you'? . . . .
>
> "Now, if these agents went there without any prior knowledge or information of operation in the drug traffic, that would be deliberate entrapment and you should acquit him. . . . On the other hand, *if they had knowledge that he had trafficked in drugs and that he was involved in the use of drugs or the sale, the transportation of drugs, and they went there with that knowledge in their own minds, wrong or right, if they had reason to believe that he was trafficking in drugs, then they had a perfect*

5. Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

6. United States v. Catanzaro, 407 F.2d 998, 1001 (3 Cir. 1969).

7. United States v. Conversano, 412 F.2d 1143, 1149 (3 Cir. 1969).

8. It may be noted that the recited instructions are almost verbatim with those set forth in § 13.13 "Unlawful Entrapment—Defined," Devitt and Blackman's "Federal Jury and Instructions," 2 Ed. 1970.

*right to do what they did, namely, to entrap him.*

"The defense here is entrapment, and you will have to decide as I read it to you—and I am paraphrasing it now—*did they have reason to believe that they were a source of the sale of drugs or didn't they?*" (emphasis supplied).

When defense counsel took exception to these "simplifying" instructions the trial judge compounded their error when he further instructed the jury as follows:

". . . *if in your opinion these agents had good reason* we will say further beyond a reasonable doubt *to believe that this man was trafficking in drugs, then they had a right to go and attempt to prove it* by whatever legal means are available. *Essentially that is what this case is all about.*

*"Now, if you don't think that the Government Agents had reason to believe that he was trafficking in drugs, then they had no right to try to prove that he was. If they did think so and they have proven to you beyond a reasonable doubt, then he is guilty and you should so find,* and the same in connection with the girl, . . ." (emphasis supplied).

Several hours after the jury commenced its deliberations it sent the trial judge this question:

"Can legal entrapment be founded on just suspicion by the agents?"

In answering that question, the trial judge re-read to the jury the correct instructions in his main charge. He then repeated his "simplifying" erroneous instructions in that charge, and the supplement to it.

In doing so, he again instructed the jury that if it found that the federal narcotic agents *"had reason to believe that these people were trafficking in drugs, then they had a perfect right to do what they did."* (emphasis supplied).

In referring to the jury's question "Can legal entrapment be founded on just suspicion by the agents?", the trial judge said:

"It is a very difficult question to answer, but you will have to remember all the evidence. *Did the agents have reason to believe based on facts that they knew, facts that were brought to their attention, that these people could be guilty of violating the narcotic laws?* . . . .

"You must search your minds in the evidence and *determine whether or not from the knowledge they had of these two people they had reason to believe that they might be guilty of this crime, and if they did they had a perfect right to attempt to, as counsel has stated, entrap them. Now, if they didn't and it was a mere suspicion,* then you should acquit them that quickly. On the other hand, *if you believe collectively that they had reason to believe that these people were trafficking in drugs, then they had a perfect right to do what they did.*" (emphasis supplied).

After defense counsel noted an exception "to so much of your supplemental charge as has to do with the reasonability of the agents' beliefs and their right to entrap the defendants," the case went to the jury.

The "simplifying" instructions in the main charge, their repetition in the supplementary charge, and in the answer to the jury's question, made a shambles of the correct instructions as to the defense of entrapment. They served to make the issue of entrapment hinge *solely* on what was in the minds of the agents—their "belief"—at the time they made their purchases of cocaine from the defendant charged in the indictment.

It is settled law that it was "inconsequential" whether the agents at the time they made their purchases of cocaine from the defendant had probable cause for approaching the defendant, or whether at the time "they had reason to believe" that the defendant was trafficking in drugs. United States v. Catanza-

ro, 407 F.2d 998, 1001 (3 Cir. 1969); Whiting v. United States, 321 F.2d 72, 77 (1 Cir. 1963), cert. den. 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114.

The sole critical issues for jury determination were "the predisposition and criminal design" of the defendant; whether the defendant's criminal conduct "was the product of the creative activity" of the narcotic agents, or whether the latter "merely afforded opportunity" for the defendant's criminal conduct.

The trial judge's repeated instructions making critical to the entrapment issue what was in the minds of the agents when they purchased the cocaine from the defendants were gratuitous and uncalled for in light of the testimony.

The Government did not seek to establish the defendant's "predisposition and criminal design" by testimony as to what the narcotic agents "believed" at the time the cocaine sales were made. It sought to establish the defendant's "predisposition" by testimony that in August 1970, a month before the first sale on September 4, 1970, defendant told one of the narcotic agents, Miller, that he could arrange with one "Chico," "his source and his partner" for a supply of cocaine; he had a "connection" and "source of supply" in San Francisco for sale of marihuana, and that he would fly to that city to arrange for an initial purchase by Miller of between 200 and 250 kilograms of marihuana; further, that in August 1970, Silver showed him a pouch-like container, containing several vials which Silver said contained narcotics. Moreover, the jury could have found "predisposition" in the defendant's own testimony, earlier recited, that prior to the sales here involved he had procured narcotics for informers Yaworski and Scourfield.

What has been said established that the trial judge committed reversible error because he so intertwined correct instructions with incorrect instructions as to negative the effect of the correct instructions and the net effect was to give proscribed equivocal direction to the jury on a basic issue.

That the direction was equivocal as to confuse the jury is evidenced not only by the question it asked during the course of its deliberations, but also by the fact that while it found the defendant guilty on Counts 1 and 2 which charged an unlawful narcotic sale on September 4, 1970, it was unable to agree on a verdict with respect to the unlawful narcotic sale on September 16, 1970, charged in Counts 3 and 4 of the indictment.

We must add that we have reached the conclusion that the trial judge's erroneous instructions compels a reversal with the utmost reluctance inasmuch as the testimony here amply supports the jury guilty verdict rendered. The circumstance of guilt however is not the dispositive factor in weighing the issue whether a defendant has been accorded a fair trial. Appellate courts are not law enforcement agents. Their function is to determine only whether a defendant has been fairly tried in accordance with due process requirements; just that and nothing more, nothing less. There is ample authority for the propositions stated.

In Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), it was squarely held that upon a review of a conviction in the federal courts, the question is not whether guilt may be spelt out of the record, but *whether guilt has been found by the jury according to the procedure and standards appropriate for criminal trials in the federal courts.* In so holding, the Court said (p. 615, 66 S.Ct. p. 406):

> "In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the

belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

In Kotteakos v. United States, 328 U. S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Court said at page 763, 66 S.Ct. at page 1247:

> "Some aids to right judgment may be stated more safely in negative than in affirmative form. *Thus, it is not the appellate court's function to determine guilt or innocence.* Weiler v. United States, *supra* [323 U.S.] at 611 [65 S.Ct. 548, 89 L.Ed. 495]; Bollenbach v. United States, 326 U.S. 607, 613–614 [66 S.Ct. 402, 90 L.Ed. 350]. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. *But they may not make them sole criteria for reversal or affirmance.* Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error." (Footnote omitted) (Emphasis supplied).

Again, in Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945) the Court said at page 611, 65 S.Ct. at page 551:

> "We are not authorized to look at the printed record, resolve conflicting evidence, and *reach the conclusion that the error was harmless because we think the defendant was guilty.* That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility." (Emphasis supplied).

For the reasons stated the judgment of conviction and sentence will be vacated and the cause remanded to the District Court with directions to grant a new trial