UNITED STATES of America, Plaintiff-Appellee,

v.

Jonathan TOWNSEND, Defendant-Appellant.

No. 75–1401.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1976.

Decided May 10, 1977.

Rehearing and Rehearing En Banc Denied June 7, 1977.

Michael B. Constance, Belleville, Ill., for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Clifford J. Proud, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and WOLLENBERG, Senior District Judge.*

CUMMINGS, Circuit Judge.

After a jury trial, defendant was convicted on four counts of a six-count indictment[1] charging firearm offenses occurring on January 24 and January 30, 1974, in violation of 26 U.S.C. §§ 5861(c), 5861(d), 5821(a) and 5871. The firearms involved were two sawed-off shotguns, and he received five-year concurrent imprisonment sentences on the first and third counts. On the remaining counts he was sentenced to five years' probation to be served consecutively to the completion of the sentence on Counts I and III.

---

* Senior District Judge Albert C. Wollenberg of the Northern District of California is sitting by designation.

1. Counts I and II charged knowing possession without payment of the making tax on January 24 and January 30 respectively. Counts III and IV charged possession without registration on January 24 and 30 respectively.

Counts V and VI charging knowing transfer of a firearm without payment of a making tax were dismissed on the defendant's motion before trial.

On appeal, defendant contends that the Government did not prove him guilty beyond a reasonable doubt because it failed to rebut his entrapment testimony and that the evidence showed entrapment as a matter of law. He also contends that the trial court erroneously permitted the Government to impeach him with prior convictions which were over ten years old. We reject these contentions and therefore affirm.

Special Agent James Warren of the Illinois Bureau of Investigation was the Government's first witness. On January 24, 1974, he was visiting informer Ulysses "Ted" Core in his apartment at 533 Collinsville Avenue in East St. Louis, Illinois. During Warren's visit to Core's apartment, defendant Townsend, who had the adjoining apartment, was admitted. When a discussion occurred about a sawed-off shotgun, defendant stated that he had a particular shotgun ready for sale because he had worked on it the previous night. Defendant told Warren he would obtain the gun and left with Core to do so. When they returned, Core set a blue and red tote bag containing the gun on the floor. Defendant took the gun from the bag and gave it to Warren, requesting $80 for it. Thereupon Warren gave the money to Core, who passed it to defendant, who then pocketed it. Warren said that Government Exhibit 1 was the shotgun he purchased from defendant and that it had a barrel length of less than 18 inches.

Warren was also present in Core's apartment on January 30, 1974. Defendant arrived and asked Warren if he was interested in purchasing another shotgun for $90, this one being a double-barreled shotgun. Warren asked defendant if he might look at the gun. When defendant returned with the gun, he asked Warren and Core to come on the back porch to avoid Core's other visitors. Defendant had a corrugated box at his feet on the back porch and took the gun therefrom at Warren's request and gave it to Warren for $90, which defendant requested Warren to hand to Core, who in turn handed it to defendant, who then pocketed it. Warren said that Government Exhibit 2 was the shotgun he purchased from defendant on January 30 and that the double barrel lengths were 11 inches.

On cross-examination, Warren testified that he had been at the Collinsville Avenue apartment building twenty or thirty times before the January 24 transaction. Core worked for the Illinois Bureau of Investigation as an informer and was paid on a case-by-case basis. Warren thought that the Bureau was withholding prosecutions of Core although he did not know what the charges against Core were. Warren admitted that when he went to the Collinsville Avenue address on January 24 he was wired for sound and intended to purchase a shotgun from defendant. Similarly, on January 30, he was wired for sound and went to the same building to buy another shotgun from defendant. Warren conceded that he gave the cash to Core who thereupon handed it to Townsend because the defendant would not take the cash at first.

Special Agent Robert Biby of the Illinois Bureau of Investigation surveyed the Core and Townsend apartments on January 24 and 30 and corroborated much of Warren's testimony about the firearms. He thought that Core, who was unemployed, had been paid $100 cash for his work as an informer in each of these transactions. He added that the Illinois Bureau of Investigation had no pending charges against Core but that other police organizations did and that the Bureau would speak up for him because of his cooperation.

Special Agent William J. Lukowski of the Bureau of Alcohol, Tobacco, and Firearms testified that on May 15, 1974, he fired Government Exhibits 1 and 2. They were in operating condition, and neither had been registered with the National Firearms Registration and Transfer Record.[2] When he arrested defendant in November 1974, he interviewed Warren but the Illinois Bureau

2. It was stipulated by the parties that both shotguns involved had been manufactured without the payment of a making tax.

of Investigation did not permit him to interview Core.

Defendant then testified on his own behalf and stated that he had known Core for eleven years but did not know that he was an informant for the Illinois Bureau of Investigation, although he had heard so and had confronted Core with the rumor which Core specifically denied. He said that Core brought him a firearm toward the end of January 1974 and asked him to keep it for Core, because he was having trouble with his "old lady," until he could sell it. Townsend retained the weapon 2–4 days prior to Warren's January 24 visit. On that date, Core told defendant to get "that piece" ready because the "dude" was coming to pick it up. Later that day, at Core's request, defendant came to Core's apartment and met Warren, whom defendant had seen at Core's apartment twice before. They talked about the gun, and defendant and Core went to defendant's apartment where Core told defendant to ask $80 for the gun and infer that it was defendant's weapon. Core carried the weapon back to his apartment where defendant told Warren that he and Core had agreed on $80 for the weapon. After Warren gave the money to Core, he and Townsend went back to defendant's apartment to split the money evenly, since Core owed defendant money.

On another occasion, defendant visited Warren at Core's apartment and delivered a weapon that he had received a day or a day and a half before from Core. The weapon was in a cardboard box which defendant took outside and put on Core's porch before knocking on Core's door. Core came out to discuss the price to ask for the gun, and then Warren came out and paid Core for the gun, with Townsend receiving $25 or $30 later when Core brought it to defendant's apartment. Defendant admitted that he was an "ex-police character," had been convicted of burglary in Missouri in 1958 and in Illinois in 1959 and had been convicted in Illinois of armed robbery in 1962.

On cross-examination, defendant admitted that he had kept the first weapon sold to Warren for two or three days and knew that it was a sawed-off shotgun. He kept the second weapon for 23 or 24 hours. On being presented on direct with Government Exhibit 2 at trial, Townsend first said that "[i]t looks familiar" but then immediately recanted by saying that he had never seen it "before in his life." On cross, the defendant reiterated that he had never seen Exhibit 2. He said that "piece" means gun in black ghetto language, and that the term was also used by persons familiar with firearms. He said he had been involved in firearms all his life and had been in service when he was 16. He added that he had been arrested with a firearm within five or ten years and had no qualms about having a gun because he was authorized to have one.

The defendant's motion for acquittal at the close of all the evidence was denied and the issue of entrapment was submitted to the jury which returned a guilty verdict as to all four counts.

### I

Defendant's principal argument is that the Government did not prove him guilty beyond a reasonable doubt, for it assertedly failed to prove predisposition beyond a reasonable doubt to rebut his testimony of entrapment.[3] Nothing in *United*

---

**3.** Since *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366, "definitively construed the defense of 'entrapment' to be focused on the question of predisposition," *Hampton v. United States,* 425 U.S. 484, 492 n. 2, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (Powell, J., concurring), it is important to note that two independent lines of analysis still combine in determining whether the subjective mental state of predisposition existed at the time of the crime's occurrence. *Id.* at 494 n. 5, 96 S.Ct. 1646. First, one considers the defendant's personal background to determine where he sits on the continuum between naive first offender and street-wise habitué. Second, one considers the degree of coercion present in the instigation law officers have contributed to the transaction. The stronger the inducement and the scantier defendant's criminal background, the greater is the need to declare an entrapment. Yet even the most habitual offender can be entrapped if the officers use coercive inducement to overbear the defendant's reluctance, *Sherman v. United States,* 356 U.S. 369, 371–373, 78 S.Ct. 819, 2 L.Ed.2d 848.

*States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366, or *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, would compel the Government to prove Townsend's predisposition by the testimony of informer Core, as the dissent suggests. Here the evidence was such that, viewing it most favorably to the Government under *Glasser,*[4] the jury could find predisposition on Townsend's part. There was ample testimony by Illinois Bureau of Investigation Agent Warren to show lack of any reluctance on Townsend's part. Thus he testified that defendant entered Core's apartment on January 24 and said the sawed-off shotgun was ready because he had worked on it the night before. Defendant said a butt would make the gun too bulky to conceal. He told Warren he would get the gun, leaving with Core to fetch it. Subsequently Core returned with a tote bag, but Townsend took the gun from the tote bag and gave it to Warren, advising him to be careful because it was loaded. He requested $80 for it, saying the only problem with the gun was that it did not have a handle but he had planned to cut the stock down to pistol-grip size and pour lead into the handle to give it weight and balance. Townsend took the money that Warren handed Core and put it in his pocket. On January 30, Townsend asked Warren if he was interested in purchasing a double-barreled sawed-off shotgun for $90. Townsend obtained it from his apartment and gave it to Warren on Core's back porch. Warren handed the money to Core, who gave it to Townsend who proceeded to pocket the cash. Defendant testified that he kept one of the illegal firearms two to three days and the other for 25–30 hours. He was familiar with firearm slang and had been involved with firearms all his life. He had been arrested with a firearm two times within five years and was an ex-police character who had been convicted of armed robbery and two burglaries.[5] He knew the

first weapon was a sawed-off shotgun but kept it anyway. These are hardly the actions of an "unwary innocent." *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366.

◼ Obviously the jury resolved the discrepancies in Warren's and defendant's uncorroborated testimony in favor of the Government. This was its prerogative since, as in *Hampton,* the evidence was sufficient to establish predisposition. As the prosecutor explained to the jury in his closing arguments as to predisposition (Tr. 105–106, 115).

1. Townsend was charged with possession of two firearms on two different occasions.
2. He had been involved in an armed robbery.
3. He was knowledgeable as to firearms.
4. He had been arrested a number of times with a firearm.
5. He had the first gun (a sawed-off shotgun) two or three days before selling it to Warren instead of getting rid of it.
6. Defendant could have called informant Core as a witness if he considered Warren's testimony were false.[6]
7. He admittedly shared in the sale proceeds.
8. He did not deny having seen the first weapon "before in his life," in contrast to the second weapon (also an illegal sawed-off shotgun).

◼ The district judge carefully instructed the jury that it must find defendant not guilty if it had "a reasonable doubt whether the defendant had previous intent or purpose to commit an offense of the character charged * * *." The court also charged that if the jury should find beyond a reasonable doubt that the defendant was

---

4. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

5. Defendant also had been convicted of perjury and another armed robbery, both of which had been reversed for trial error.

6. This statement was of course in response to defendant's jury argument that the Government could have called Core as a witness.

"ready, willing \* \* \* to commit the crimes such as charged in the indictment, whenever the opportunity was afforded, and that government officers or their agents did no more than offer the opportunity," then the jury should find that the defendant was not a victim of entrapment. The jurors were earlier told that if defendant had no previous intent or purpose to violate the law but was induced by law enforcement agents to do so, the doctrine of entrapment would forbid his conviction. The court added that if a person already has the readiness and willingness to break the law, the mere fact that the government agents provide what appears to be a favorable opportunity is not entrapment. (Tr. 126–127.) These replete instructions[7] fully covered predisposition and would prevent any reasonable jury from convicting defendant in the absence of predisposition.

The dissent strives mightily to distinguish *Masciale v. United States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859. In *Masciale* government agent Marshall was introduced to Masciale by government informer Kowel as being a "big narcotics buyer." The question was whether entrapment as a matter of law was made out and, if not, whether the jury could be permitted to find as it did. "[E]ntrapment could have occurred in only one of two ways. Either Marshall induced petitioner, or Kowel did." 356 U.S. at 388, 78 S.Ct. at 828. Masciale conceded that Marshall had not induced him.

■ However, Masciale argued that he was entrapped by Kowel who waged a campaign to persuade Masciale to sell heroin:

"It is true that the defendant further testified that Kowel over a period of several months had urged him to engage in the narcotics traffic, pointing out the pecuniary rewards which might be expected both by the defendant and by Kowel; that for months he had rebuffed Kowel's importunities; that in meeting Marshall and purporting to cooperate he was in fact merely 'stringing him along' in order to increase Kowel's prestige in the eyes of Marshall." 236 F.2d 601, 603 (2d Cir. 1956).

Petitioner's testimony on this score was undisputed. But the Supreme Court, while finding that Masciale had made out a *prima facie* showing of entrapment, held that entrapment as a matter of law had not been made out and that the jury was free to disbelieve his testimony even in the absence of any rebutting evidence by the Government:

"Petitioner argues that this undisputed testimony explained why he was willing to deal with Marshall and so established entrapment as a matter of law. However, his testimony alone could not have this effect. While petitioner presented enough evidence for the jury to consider, they were entitled to disbelieve him in regard to Kowel and so find for the Government on the issue of guilt." 356 U.S. at 388, 78 S.Ct. at 829.

Moreover, as in the instant case, the defendant did not attempt to call the informer as a witness, adverse or otherwise, in order to substantiate his story, nor did the Government. 356 U.S. at 388 n. 4, 78 S.Ct. 827.[8]

In two pre-*Hampton* reported cases where, as here, contraband was not supplied by the Government, the First and Tenth Circuits permitted the jury to disbelieve defendant's uncontradicted testimony.

**7.** According to the record, the entrapment instructions were tendered by the defendant without objection by the Government (Tr. 100–101).

**8.** The dissent asserts that the existence or nonexistence of predisposition is to be determined during the time period before the crime is completed. We, of course, agree. However, probative evidence of predisposition is not rigorously confined to an *a priori* time frame. Surely the demeanor (as distinguished from the substantive testimony) of the defendant on the stand, although adduced after the crime, is direct, probative evidence going to the existence or nonexistence of predisposition. Similarly, the enthusiasm and initiative in commission and the depth of involvement shown by the putatively entrapped defendant in the crime also can relate back to the *a priori* time frame. The resolution of these subtle factual issues is at the very heart of the traditional function of the jury.

*United States v. Jett,* 491 F.2d 1078 (1st Cir. 1974); *United States v. Johnson,* 495 F.2d 242 (10th Cir. 1974). See also *United States v. Gurule,* 522 F.2d 20 (10th Cir. 1975), certiorari denied, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800. Similarly, here, the jury was entitled then to disbelieve Townsend.

The dissenting opinion here does not rest on government misconduct, which was involved in both *United States v. Bueno,* 447 F.2d 903 (5th Cir. 1971), and *United States v. West,* 511 F.2d 1083 (3d Cir. 1975). In *Bueno,* "entrapment" had not yet taken on a term of art meaning corresponding to predisposition. It then contained the objective element of police misconduct and the subjective element of predisposition. Judge Roney carefully distinguished between the subjective question of why and the objective question of what:

> "The evidence of willingness to make the sale, which is common to the usual entrapment defense, is no answer. In such cases where the issue is willingness or unwillingness of the defendant, the defense becomes a jury question because the sale itself constitutes evidence of willingness contrary to the defense of unwillingness. The issue there is not what he did but why he did it, i. e., because of coercion. The issue here is what he did, i. e., taking heroin from one government agent and selling it to another. The government's case cannot rest on the mere fact that he entered into the Informer's plan willingly." 447 F.2d at 906.

Thus by its own terms, *Bueno* concedes that a finding of predisposition is supportable even if a jury based its finding only on its view of the defendant's credibility. In fact the Fifth Circuit itself has rejected a *Bueno* rule in the true entrapment defense situation. *United States v. Workopich,* 479 F.2d 1142 (5th Cir. 1973). Likewise in *West,* the narrow holding dealt only with going for-

ward with evidence in the objective case of government misconduct (511 F.2d at 1086). Accepting this holding, *West* has no direct precedential value with respect to a requirement that the Government has a burden of going forward with evidence to prove the existence of the subjective element of predisposition.

█ Even reading this pair of cases as the defendant suggests, Warren's and Lukowski's testimony and Townsend's own account satisfied the Government's burden (imposed in *Bueno* and *West*) of showing predisposition. Thus the jury could and obviously did credit Warren's and Lukowski's version of the January 24 and 30 events as well as defendant's own highly damaging admissions. Indeed, as in *Hampton,* 425 U.S. at 487 n. 3, 96 S.Ct. 1646, Townsend's trial counsel seems to have conceded predisposition, albeit inadvertently.[9] From the Government's and defendant's testimony, we conclude that the jury could find defendant had a predisposition beyond a reasonable doubt to commit these offenses.

## II

As to defendant's secondary argument that the evidence of entrapment was established as a matter of law, his counsel states that the Government may not "ensnare a person who could not possess a predisposition to commit a crime" (Br. 13–14). But, as already shown, the Government did adduce sufficient evidence to go to the jury with respect to predisposition. To hold otherwise would be "on the sole basis of the defendant's unverified testimony," as the dissenting opinion admits. Our rejection of defendant's first argument necessarily requires us to reject his conclusion that entrapment as a matter of law was established. *United States v. Spain,* 536 F.2d 170, 173 (7th Cir. 1976), certiorari denied, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97.

**9.** In closing argument below, while denying predisposition, defendant's counsel first stated:

> "You don't leave your common sense outside. You know as well as I do in watching that man [the defendant] testify and hearing about his background that if Mr. Core want-

ed him to keep a tank or a machine gun or if he had an opportunity to get a tank or a machine gun and make a few bucks, he would do it. Let's lay our cards on the table." (Tr. 112)

### III

■ Defendant's final point is that the court should not have admitted stale convictions for the purpose of impeaching him. Defense counsel had moved preliminarily for a protective order to prevent the Government from using over ten-year-old felony convictions against the defendant for impeachment purposes. Before the Government rested, the court ruled that it would allow the Government to use those convictions. Although, as the trial judge noted, Rule 609(b) of the Federal Rules of Evidence [10] had not yet become effective in permitting the testimony, he said he was motivated by defendant's lack of reform and rehabilitation and by his continuing "run-ins for violations of the law," including a consistent history of felony convictions commencing in 1957, with other recent weapon and theft charges still pending.

Since Rule 609(b) had not yet become effective, the trial judge could have permissibly allowed in evidence much staler convictions than these. *United States v. Kowalski,* 502 F.2d 203 (7th Cir. 1974), certiorari denied, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660. Furthermore, the court's discussion of Rule 609(b) shows that he intended to abide thereby, and his comments to counsel adequately indicated why he thought "the probative value of the conviction[s] supported by specific facts and circumstances substantially outweighs * * [their] prejudicial effect," as required by

the new rule. See *United States v. Mahone,* 537 F.2d 922, 928–929 (7th Cir. 1976).

The judgment is affirmed.[11]

SWYGERT, Circuit Judge, dissenting.

In my judgment, the crucial questions are whether the Government failed to rebut the defendant's testimony on entrapment and whether such a failure requires a reversal. Core was working as an informer for the Illinois Bureau of Investigation (IBI). At the time Core had no other occupation. He was being paid on a case by case basis in payments ranging between $50 and $100 per case.[1] The IBI did not provide him with either an income tax form W-2 or a form 1099. Moreover, the IBI had promised that it would "speak up for him" in connection with certain criminal charges then pending against him. Agent Warren's testimony concerned the events he witnessed at the two sales. When he asked Townsend to get the gun at the first sale, both Townsend and Core left the apartment. When they returned, it was Core who was carrying the tote bag containing the gun that was sold. When Warren tried to pay Townsend for the gun, he refused to accept the money. With reference to the second sale, it should be added to the facts as described by the majority that Core was present on the porch during the sale at which Townsend again refused to accept the money.

---

**10.** Rule 609(b) of the Federal Rules of Evidence provides in pertinent part:

"Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or the release of the witness from confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect * * *."

**11.** Defendant argues that paying Core on a contingent fee basis when he supplied the contraband was improper. However, the Government's behavior was not so outrageous as to bar Townsend's conviction as a matter of due process, as discussed in the concurring opinion of Justice Powell (joined by Justice Blackmun)

in *Hampton,* 425 U.S. at 495, 96 S.Ct. 1646. As the dissent here admits, an approach stressing unlawful government misconduct in the instructions submitted to the jury was rejected by the *Hampton* plurality. See *United States v. Gonzales,* 539 F.2d 1238, 1240 n. 1 (9th Cir. 1976).

**1.** During the trial, Warren testified:

Q. And was this the usual IBI procedure that he was paid on a case by case basis?
A. Yes.
Q. And the more cases that he brought to the IBI, the more money he made. Is that correct?
A. Yes.

* * * * * *

Q. Was he paid by check or by cash?
A. By cash.

**160**

The majority attempts to erect "corroboration" of Warren's testimony by that of agents Lukowski and Biby. Lukowski, an agent of the Alcohol, Tobacco and Firearms Division of the United States Treasury (AT&F), testified only to the fact that he arrested Townsend in November 1974 (ten months after the sales), that he test-fired and inspected the guns and furnished the details of the inspection, and that the IBI refused to allow him to interview Core. The testimony of agent Biby of the IBI concerned arrangements between the IBI and the informer Core, his receipt of the guns from Warren, and his observations while on surveillance during the sales. The agents' observations at Core's apartment were limited to who entered and exited at the times of these occurrences. There was no "corroboration" by these witnesses of Warren's testimony of what happened inside the apartment.

After the Government rested its case-in-chief Townsend testified in his own behalf: He had known Core "on and off" for eleven years; had loaned him, among other things, money and his car; and had lived next door to Core for about a month prior to January 1974. Townsend had seen Warren at Core's apartment on two occasions. Three or four days before the first sale, Core brought the gun involved in that sale to hold for him because Core was having difficulty with his "old lady." Townsend placed it in a bag and kept it in his closet. On January 24 Core "yelled through the wall" to Townsend to get the gun ready because the "dude" was coming to pick it up; a short time thereafter he called to Townsend to come to his apartment. Later while they were both in Townsend's apartment, Core told Townsend that since he owed him money, Townsend should give the impression that the gun belonged to him. After the first sale, Core had talked with Townsend about another gun he was planning to sell.[2] The day before Warren purchased the second weapon, Core gave the gun to Townsend

and asked him to sand the barrel where it had been sawed off. He discussed a price for Townsend to ask and how much he would pay Townsend. Core then called Warren to the porch who bought the gun for ninety dollars. Townsend later received a share of this money from Core.

**I**

The majority enigmatically asserts: "Nothing in *United States v. Russell*, 411 U.S. 423, [93 S.Ct. 1637, 36 L.Ed.2d 366,] or *Hampton v. United States*, 425 U.S. 484, [96 S.Ct. 1646, 48 L.Ed.2d 113,] would compel the Government to prove Townsend's predisposition by the testimony of informer Core, as the dissent suggests." No such claim is made. Neither *Russell* nor *Hamilton* touch on the precise issue that is crucial in this case, whether the Government had a burden to rebut the defendant's testimony, despite the majority's reliance on these cases.

Moreover, the facts in both *Russell* and *Hampton* are distinguishable from those in the case at bar, primarily in that predisposition was conceded by the defendants in those cases as was not done here. In *Russell* an undercover narcotics agent offered to supply the defendants who were illegally manufacturing a controlled drug, with an essential, but not illegal, ingredient difficult to obtain on the market. The agent supplied that ingredient and observed the manufacturing process. Because the defendants conceded the issue of predisposition, the Supreme Court held that despite the Government's involvement, due process was not offended, and affirmed the conviction. The Court, however, specifically left open the possibility that there may be some situations in which the Government becomes so involved or its conduct is so outrageous as to shock the conscience and thus violate due process.

2. Townsend testified:
   Q. Now prior to that day, did you have any conversation with Ted about a second weapon?

   A. Yes. It was always a running conversation about different weapons or different cars he was planning on selling, you know.

In *Hampton, supra,* the opinion of a plurality of the Court only went a step further and ruled out the possibility, left open in *Russell,* that there may be some cases in which governmental conduct reaches such proportions that it renders predisposition irrelevant. In that case the defendant offered proof that the heroin which he sold to a federal undercover agent was supplied him by an informer coconfederate who was a pool-playing acquaintance. The defendant further contended that the informer duped him into believing they were selling fake drugs to gullible buyers. The trial court refused to instruct the jury that it must acquit the defendant if it found that the informer, in the employ of or acting on behalf of the Government, had supplied the narcotics sold to the undercover agent. The instruction would also have told the jury that it need not consider at all the predisposition of the defendant. The Supreme Court affirmed. Thus it can be seen that neither the *Russell* Court nor the *Hampton* Court was faced with the issue presented in the case before us.

II

I cannot agree with the defendant that he was entrapped as a matter of law. This would require holding on the sole basis of the defendant's testimony that he was entrapped. On the other hand, the Government had the burden of producing sufficient proof that the defendant was not entrapped. The record discloses the Government did not discharge its burden.

To raise the defense of entrapment, a defendant must present evidence that: (1) he was induced to commit the offense through the conduct of a governmental agent, and (2) he was not predisposed to commit it. But when such evidence has been presented, the prosecution has the burden of showing no entrapment. "When the defense of entrapment is properly raised the burden of proof is on the Government to prove beyond a reasonable doubt that the defendant was not entrapped." *United States v. Silver,* 457 F.2d 1217 (3d Cir. 1972).

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court reaffirmed the entrapment test developed in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). That test focuses primarily on the element of predisposition, the subjective state of mind of the defendant. Since *Sorrells* there has been an ongoing minority view in the Supreme Court that the defense of entrapment should depend not on the subjective attitude of the defendant but rather on the methods used by law enforcement officers in snaring criminals by the use of decoys and informers. That view would adopt an objective test with respect to the lawfulness of the police conduct. *See Russell,* 411 U.S. at 441–45, 93 S.Ct. 1637 (Steward, J., *dissenting*). Despite this minority view, however, the Court in *Russell* "definitively construed the defense of 'entrapment' to be focused on the question of predisposition." *Hampton v. United States,* 425 U.S. 484, 492 n. 2, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., *concurring*).

In both *Russell* and *Hampton* predisposition was conceded; thus, the only question remaining was whether the Government had become "overinvolved" to the point of violating due process by supplying an essential ingredient of the contraband in one instance and the contraband itself in the other instance. In the case at bar, on the other hand, predisposition was not conceded: it was the issue. Townsend, although by his own admission an "ex-police character", had no prior record of dealing in firearms. The majority tries to bolster its conclusion that Townsend was predisposed by the fact that he had been arrested with firearms and convicted of armed robbery. There was, however, absolutely no evidence that he was dealing in sawed-off shotguns or other illegal firearms at the time or at any time previously. Townsend's record of these arrests and convictions was totally irrelevant to whether or not he was predisposed to sell illegal firearms before he was solicited by Core.

It was Townsend's contention that Core, an acquaintance of eleven years, took advantage of his willingness to help a friend in order to trick him. Townsend testified that Core had brought him the guns and asked him to keep them in his apartment. As to the first sale to agent Warren, Townsend testified that Core told him to ask eighty dollars for it and to give the impression that it was Townsend's weapon. The second sale followed the same pattern. Townsend's testimony was unrebutted by anything Warren said. Thus all the evidence at the time the defense rested presented a picture of Core, working for the IBI under a type of bounty system (one which would certainly encourage set-ups), luring Townsend into a "partnership" of selling two illegal sawed-off shotguns to an undercover governmental agent.

The majority finds evidence of predisposition in Townsend's participation in the sale, such things as his receipt of the money from Core and his statements that he had worked on the guns. But this misses the point. The majority hopelessly confuses the issue. The flaw in its analysis is that in order to assert an entrapment defense, a defendant must necessarily admit committing the crime. Townsend admits that he helped to sell illegal firearms. The actions described by the majority as evidencing predisposition were all either part of the commission of the crime or immediately preparatory to its commission. Townsend's contention is not that he did not aid in the sale of the guns: this, obviously, cannot be so if he claims entrapment. Townsend contends merely that before Core importuned and tricked him into making the sale, he had no predisposition to sell illegal firearms. Thus, the critical time frame for predisposition evidence, misapprehended by the majority opinion, is the time immediately prior to the IBI's solicitation of the defendant and not during the crime's commission.[3]

When the defense rested, Townsend had sufficiently raised the defense of entrapment such that the Government had the burden to prove no entrapment beyond a reasonable doubt. This it did not do, as I shall now demonstrate.

### III

Two cases of striking similarity to the one at bar have been decided by the Fifth and Third Circuits, and they outline the Government's burden here. *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971), predated *Russell*. David Bueno was convicted of selling heroin to an undercover federal agent to whom he was introduced by an informer employed by the Government. The agent testified that the defendant was "ready, willing, and able to sell the heroin, was not reluctant, did not have to be persuaded, and offered to sell more to the agent at any time." 447 F.2d at 904. The defendant testified that he and the informer, both narcotic addicts, had met in Juarez, Mexico, and participated in a "fix," using heroin that the informer had bought; that upon returning to the United States, the informer had on several occasions asked him to make a sale of the remaining heroin; and that finally the informer lured him into meeting with the undercover agent to whom the heroin was sold. He further testified that a second sale was arranged by the informer who again purchased the heroin. The informer did not testify. The Fifth Circuit reversed the conviction holding that if the defendant was to be believed, "the sales of heroin were made through the creativity of the Government" and that, if so, the conviction could not stand. The court stated that "[t]he Government's case cannot rest on the mere fact that he [Bueno] entered into the informer's plan willingly," and indicated that the "issue . . . is what he did, *i. e.*, taking

---

3. The majority makes much of defense counsel's statement that the defendant might do almost anything for money. This statement is not evidence in the case and cannot be used to carry the Government's burden of proof. Further, it is not even relevant to the issue of predisposition. The most that such a statement says about the defendant is that he is a weak-willed person, and not that he had any predisposition to sell illegal firearms. The majority, by referring to counsel's remarks, seems to sanction the actions of law enforcement agents in seeking out the weak-willed in order to fabricate crimes.

heroin from one Government agent and selling it to another." 447 F.2d at 906. This line of reasoning accords with the previously referred to minority view in the Supreme Court and stresses the alleged unlawful conduct of the Government agents. The Court decided that the defendant's version of the governmental involvement had to be accepted and held that the Government in not producing the informer as a witness had failed to rebut the defendant's version; "the Government has the duty to come forward with contrary proof, if it is to carry its ultimate burden of proving guilt beyond all reasonable doubt." 447 F.2d at 906. This approach is important to the analysis of the. instant case. The *Bueno* court applied this approach to the first element of an entrapment defense, governmental inducement. It is similarly applicable to the second element, predisposition, which is at issue in this case.[4] Despite its stress on unlawful Government conduct (still viable after *Russell* as conduct which shocks the conscience, but subsequently rejected by a plurality in *Hampton*), I believe that the Fifth Circuit's analysis with respect to the Government's discharge of its burden of proof is correct.

*United States v. West*, 511 F.2d 1083 (3d Cir. 1975), was decided by the Third Circuit after *Russell*. Defendant Gary West was convicted of selling heroin on two occasions and of possession on a third occasion. The Government's evidence was principally based on the testimony of a Philadelphia undercover police officer who had arrested Chieves, the informer, on a narcotics charge. Following this arrest, the officer arranged with Chieves to introduce him to others dealing in drugs. Thereafter Chieves introduced the defendant to the undercover officer. The defendant and Chieves agreed to sell heroin at frequent intervals to the officer on a consignment basis. After two consignments had been delivered and paid for, the defendant was arrested, allegedly en route to deliver a third consignment. The defendant testified that he and Chieves were old friends and that Chieves, upon learning of West's serious need for money, proposed that they join in a scheme to sell diluted heroin to the officer, an "acquaintance" of Chieves. The defendant and Chieves arranged that the latter would supply the heroin, contact the buyer, and divide the profits; however, Chieves wanted the defendant to hold himself out as the seller. The defendant further testified that he was regularly employed as a City of Philadelphia truck driver and had never before been engaged in the narcotics traffic.

The court, following the *Bueno* rationale, said that when "the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration." According to the Third Circuit, *Russell* does not sanction this type of governmental conduct. The court took note of the fact that the defendant's testimony was the only evidence of the source of the heroin or of the "way in which Chieves enlisted him in the enterprise." It also noted that the police officer's testimony about his recruitment of Chieves, a charged offender, to find buyers of illicit drugs lent plausibility to West's testimony of Chieves as his source. The court concluded:

---

4. I must disagree with the Fifth Circuit's dicta in *Bueno* on the question of predisposition. It did not specifically address this question as it considered predisposition to be not dispositive because of the degree of governmental misconduct. *Bueno* cast aside the question of predisposition by saying that the sale itself constituted evidence of willingness sufficient to carry the issue to the jury. But this approach to finding predisposition is misplaced in point of time, and if it were true, the Government would never have to present evidence of predisposition when a sale was involved (many entrapment cases deal with sales of contraband). With both governmental conduct nearly irrelevant and the burden of proving predisposition, in effect, always on the defendant, there would be little, if anything, left to the defense of entrapment. In its preoccupation with the governmental misconduct, I believe the *Bueno* court overlooked the inconsistency with its analysis of the burden of proof presented by this dicta.

Once this evidence of the source of the narcotics was introduced the burden was upon the prosecution to prove beyond reasonable doubt that the government informer did not supply the drugs. *United States v. Silver*, 3d Cir. 1972, 457 F.2d 1217; *United States v. Landry*, 7th Cir. 1958, 257 F.2d 425; *United States v. Bueno, supra.* This the government did not even attempt to dispute. 511 F.2d at 1086.

Although the *West* court found a sufficient basis in the "intolerable" police conduct to call for reversal, it found that it could equally base that result on the alternative holding that the Government had not met its burden of proving predisposition on West's part.

While we view West's case as one of intolerable conduct by government agents, one supplying and the other buying the narcotics, the same result is reached if the entrapment aspect of this case is analyzed as depending solely on the predisposition of West to engage in illicit drug traffic. 511 F.2d at 1086.

The Third Circuit found that the Government had presented no evidence to establish predisposition sufficient to dispute West's claim of entrapment. In so doing the court rejected the Government's argument that the first individual sale could be used to demonstrate a predisposition for the later sales in the same series, indicating that the crucial time frame of reference for predisposition was the time immediately before the entire series of sales was induced by the Government informer. Thus it concluded that West's testimony was unrefuted on the issue of predisposition.

In the instant case Townsend's testimony was the only evidence presented concerning both the source of the guns and the manner in which Core "enlisted him in the enterprise." Here also we have agent Biby's testimony of his recruitment and manner of remuneration of Core to lend plausibility to Townsend's testimony that Core was his source and to suggest a possible motive for Core's set-up of Townsend.

The Third Circuit in *West* rejected the proposition, argued by the Government in the instant case, that a defendant's unrefuted testimony, on its face sufficient to establish entrapment, must be submitted to the trier of fact, and upon a verdict of guilty, the Government should be deemed to have met its burden of proving beyond a reasonable doubt that there was no entrapment. Judge Hastie wrote:

It seems to us that this in effect puts the burden of proof on the entrapment issue upon the accused. To avoid this improper consequence the burden of going forward, in this case the burden of making some showing contrary to the testimony of the accused, must be imposed on the prosecution, once evidence, sufficient on its face to prove entrapment, is introduced by the defense. In the absence of some such showing the court should enter a judgment of acquittal.

What this procedural rule does is to prevent the trier of fact from ever passing upon the credibility of *certain defense testimony*, unless and until the prosecution has made some showing to the contrary. But this is no unreasonable burden here since a government agent knows and can testify to the relevant facts, thus getting the issue and the question of credibility it involves to the jury. We deem this a fair and appropriate way of avoiding an improper imposition of the burden of proof upon the accused. 511 F.2d at 1087. (emphasis added.)

I believe this language supplies the correct answer to the Government's argument. Unless the Government is required to come forward with some proof on the issue of entrapment, the burden of proof, in effect, falls upon the defendant, denying him of his right to have his guilt proved beyond a reasonable doubt by the prosecution.

IV

According to *Russell* the essential element of an entrapment defense is lack of predisposition. Since the Government did not dispute that defendant was induced by Government agents to commit the crime,

the Government's burden becomes one of proving the second element of predisposition beyond a reasonable doubt. The prime question in this case then becomes whether the Government has discharged this burden.

"Predisposition" is at best an elusive term. *See United States v. Russell,* 411 U.S. at 442–43, 93 S.Ct. 1637 (Stewart, J., *dissenting*). It requires an attempt to determine what was in a defendant's mind prior to his commission of the crime. In some situations predisposition is conceded, as in *Russell* and *Hampton.* In other situations, even though predisposition is disputed, the facts clearly demonstrate from a pattern of activity prior to the inducement a willingness or proclivity to engage in crimes of the nature charged. In still others, as here, the defendant's predisposition is substantially in question. In these last cases the trier of fact should have all the factual light that can be brought to bear on the question if justice is to be done.

It is, thus, upon presentation of "certain defense testimony" fitting into this last category and putting predisposition substantially in question that an obligation on the Government to go forward with contrary evidence arises. Of course, this obligation will not arise where the evidence introduced is totally incredible or fails to present the essential elements of entrapment. But once it does arise, the amount of governmental involvement again becomes important and relevant, even where it does not surpass the bounds of due process. In those cases involving Government informers, the informer's testimony will ordinarily be required for the Government to meet its obligation. This is so because the Government undercover agent who makes the purchase of contraband will not usually have personal knowledge of the interactions between the defendant and the informant so as to be able to refute the defendant's testimony on these points. This is exactly what occurred in the instant case. Core was the only person who could possibly present any refutation of Townsend's testimony on how he was solicited and tricked into making the sale. Although no per se rule is called for, when the Government's involvement has

reached the degree that it has in this case and that it had in *Bueno* and in *West,* the essentiality of the informer's testimony becomes absolute. Thus, the more the Government becomes involved in the alleged entrapment, the more compelling is its need to present all of the evidence that is available in order to meet its burden of proving that the defendant was predisposed. Further, the more the Government agents become involved, the greater the Government's accessibility to refutation testimony, which testimony would properly raise the issue to one of credibility enabling the issue of predisposition to go to the jury for resolution.

In the instant case, there appears to be no reason why the Government could not call Core to testify. It is no answer to say, as does the majority, that if defendant wished to corroborate his account of his interactions with Core, he could have called Core to testify. The defendant here sufficiently raised the defense of entrapment and it was then up to the Government to disprove that defense beyond a reasonable doubt. *Silver, supra.* With this the majority does not appear to disagree. In my view it was the Government's duty to call Core as its rebuttal witness if it was to raise the issue of predisposition to one of credibility sufficient to go to the jury to decide whether it had discharged its burden of proof. Only in this way could fundamental fairness be achieved.

The implication cannot be made that the only reason the defendant could have to not call Core to the stand would be because he knew that Core would refute his account. First, it is unwise for an appellate court to speculate on the reasons for presentation or nonpresentation of evidence. Second, the implication the majority finds in Townsend's omission to call Core as a witness can be applied to the Government's omission to do the same.

The Government and the majority cite *Masciale v. United States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958), in support of their position. That case, however, is clear-

ly distinguishable. In the first instance there was no evidence or contention on the defendant's part that the informer or anyone connected with the Government supplied the illicit drugs in question. Thus, governmental misconduct did not come close to its proportions in the instant case. There was not only no outrageous governmental conduct alleged, but merely a minimal involvement in which the informer introduced the defendant to the undercover agent. It might be questioned whether such evidence would be sufficient even to raise the defense, and the facts themselves present a different situation. Further, an important distinguishing factor was noted by the court in *West, supra.* Although there was no Government evidence directly contradicting Masciale's testimony that his will had been overborne, the prosecution's burden was satisfied by evidence which showed that when he was solicited, Masciale had not simply responded by selling narcotics, but "had boasted of his acquaintance with someone 'high up in the narcotics traffic' and of his ability to procure heroin." *West, supra* at 1087. Moreover, the issue actually decided and focused upon in *Masciale* was that the defendant's undisputed testimony did not establish entrapment as a matter of law so as to require a directed verdict of acquittal and that the trial court correctly submitted the case to the jury.

The Government argues and the majority seems to agree that *Hampton* has "substantially" eroded *Bueno* and *West.* I think this argument is patently flawed. The specific holding of the plurality in *Hampton* was that when predisposition of a defendant is "established," the defense of entrapment is unavailable regardless of the degree of "governmental misconduct." [5] Predisposition was conceded in *Hampton* while it was in dispute here.

In summary, I would hold that the Government did not meet its burden of

proving the defendant guilty beyond a reasonable doubt and reverse his conviction.

When a government informer for a fee supplies contraband and takes advantage of an ostensibly weak-willed but nondisposed "friend" in the commission of a crime, due process demands that the prosecutor produce all the evidence available. Moreover, justice is not served when this court condones the prosecutor's avoidance of his obligation. In the words of Mr. Justice Sutherland in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935): "[The prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

---

5. Mr. Justice Powell, although maintaining that the conviction in *Hampton* should be affirmed on the basis of *Russell*, disavowed such a per se rule:

> Disposition of those claims, [*Russell* and its predecessors] did not require the Court to

consider whether overinvolvement of government agents in contraband offenses could ever reach such proportions as to bar conviction of a predisposed defendant as a matter of due process. *Hampton*, 425 U.S. at 493, 96 S.Ct. at 1651 (Powell, J., *concurring*).